UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SURFACE ENGINEERING and ALLOY COMPANY, INC.
*d/b/a* EXTREME COATINGS,

Plaintiff,

v. Case No: 8:24-cv-00483-JLB-AEP

US THERMAL SPRAY, LLC, *et al.*,

Defendants.
_______________________________________/

# ORDER

This action centers on two long-time employees leaving Extreme Coatings to set up their own competing business a few miles away. Plaintiff sued its former employees and their new company for violation of the Federal Defend Trade Secrets Act of 2016 and the Florida Uniform Trade Secrets Act, breach of fiduciary duty, and tortious interference.

The case is now before this Court on Defendants' Motion for Summary Judgment on all Four Counts of the Amended Complaint (Doc. 81) and Plaintiff's Corrected Motion for Partial Summary Judgment as to Liability for Breach of Fiduciary Duty (Count III). (Doc. 84). The parties have responded and replied to each other's motions for summary judgment. (Docs. 100, 102, 106–107). Upon careful review of the parties' briefing and the summary judgment record, this Court concludes that Defendants' Motion for Summary Judgment on all Four Counts of the Amended Complaint (Doc. 81) is due to be **GRANTED in part**, and Plaintiff's

Corrected Motion for Partial Summary Judgment as to Liability for Breach of Fiduciary Duty (Count III) (Doc. 84) is due to be **DENIED as moot**.

## BACKGROUND[1]

Defendant Gregory Quinn was hired by Extreme Coatings ("Extreme") in 1998 to do sales. (Doc. 86 at ¶ 2). He worked with Extreme for 22 years, ultimately serving as its sales manager. (Doc. 79 at ¶ 3). Defendant Thomas Kvinge was hired by Extreme in 2004 to do end-user sales. (Doc. 86 at ¶ 3). He worked for Extreme for 15 years and served as its vice president of technical sales. (Doc. 79 at ¶ 4). Prior to their employment with Extreme, neither Mr. Quinn nor Mr. Kvinge had any prior training or experience in the field of refurbishing and coating feed screws for the plastics industry. (Doc. 86 at ¶ 1).

In May 2018, Mr. Quinn decided to leave Extreme and form a thermal spray company that would compete with Extreme. (*Id.* at ¶ 5). Days later, Mr. Quinn asked Mr. Kvinge to join him in this project. (*Id.* at ¶ 6). In June 2019, Mr. Kvinge asked Extreme's owner, Curtis Kadau, about taking ten weeks off from work to spend time with his wife, and Mr. Kadau granted the request with paid time off. (*Id.* at ¶ 13). Mr. Kvinge spent "much of this time" "working on the startup of a competing company that [he was] trying to form." (*Id.*).

[1] The background section discusses undisputed facts after this Court's review of the statements of material facts and responses thereto. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). To the extent the Court considers disputed facts, the Court views those facts in the light most favorable to Plaintiff. *Travelers Prop. Cas. Co. of Am. v. Moore*, 763 F.3d 1265, 1268 (11th Cir. 2014).

While Extreme employed him, Mr. Quinn also asked Sean Litton, another Extreme employee, to join the project. (*Id.* at ¶ 7). And during their employment at Extreme, Mr. Quinn and Mr. Kvinge invited another Extreme employee, Justin Ferguson, to join in the conversations regarding the project. (*Id.* at ¶ 8). During their employment at Extreme, Mr. Quinn and Mr. Kvinge relied on Mr. Ferguson to recommend materials and equipment needed for Mr. Quinn's project. (*Id.* at ¶ 9). Mr. Quinn and Mr. Kvinge actively prepared for the project while still employed at Extreme by seeking financing, investigating equipment and fabrication needs, identifying and securing a factory lease, and preparing a Business Plan. (*Id.* at ¶ 11). This Business Plan for the project was derived from Extreme's sales and cost-of-goods information. (*Id.* at ¶ 12).

On August 4, 2019, after multiple efforts to secure private financing failed, the individual defendants tried one last time to obtain financing from JPMorgan Chase Bank. (*Id.* at ¶ 14). To make their projections look more favorable to secure financing, they increased their new company's expected revenue from six of Extreme's customers using Extreme's revenue information. (*Id.*). And they also told their prospective lender that "Cincinnati Milacron is the largest OEM of injection molding machines manufacturing in North America . . . [and has] committed to sending all of their work to [the new company] to receive this product." (*Id.*).

Mr. Kvinge formally resigned from Extreme on August 19, 2019. (*Id.* at ¶ 3). Mr. Quinn resigned from Extreme on September 23, 2019. (*Id.* at ¶ 2). At the time

Mr. Quinn and Mr. Kvinge left Extreme's employ, everything they knew about the refurbishment and coating of feed screws for the plastics industry had been learned during their employment at Extreme. (*Id.* at ¶ 4).

Mr. Quinn's September 23, 2019, resignation email to Extreme stated:

> Curt,
>
> I am writing to inform you that I am resigning from Extreme Coatings. I have given this decision much thought and consideration. Ultimately, I have concluded that I am no longer happy at my job and am unable to make the changes necessary to correct the situation.
>
> Tom and I have decided to start our own company offering Carbide coatings to the plastics industry. The plastics industry is big enough to support two Carbide vendors and we are confident a second source will be welcomed.
>
> I will work with you and the staff to hand over open projects and will be available after my departure to answer questions and offer support so that this transition is seamless to our customers. My last day will be October 4th.
>
> Sincerely,
>
> Gregory D. Quinn

(Doc. 79 at ¶ 13).

Mr. Quinn and Mr. Kvinge formed US Thermal with the Florida Secretary of State on the day after Mr. Quinn's resignation, September 24, 2019. (*Id.* at ¶ 14). After leaving Extreme, they communicated with an Extreme employee, Corey Boyer, about project equipment. (Doc. 86 at ¶ 10). And after they resigned from Extreme, they hired a company named Arzell, Inc. out of Texas to design, manufacture and install their thermal spray facility. (Doc. 79 at ¶ 15).

Before the present lawsuit was filed, the parties had entered into five tolling agreements to preserve Extreme's claims, with the first one being effective "as of September 8, 2022," nearly three years after Mr. Quinn's resignation. (Doc. 86 at ¶ 2; Doc. 79 at ¶¶ 84, 86). Extreme emailed a notice of termination of the Fourth Amended and final Tolling Agreement on January 3, 2024. (*See* Doc. 79 at ¶¶ 87, 88; Doc. 103 at ¶ 88). Extreme ultimately filed this lawsuit against US Thermal Spray LLC and the individual defendants on February 23, 2024, more than four years after Mr. Quinn's resignation. (Doc. 86 at ¶ 2; Doc. 79 at ¶ 21).

Extreme claims that the totality of its feed screw refurbishment and recoating process constitutes a trade secret. (Doc. 79 at ¶ 24). But Extreme has no written non-competition, non-disclosure, confidentiality, or non-solicitation agreements with either Mr. Quinn or Mr. Kvinge. (*See* Doc. 103 at ¶¶ 5–8). Extreme had an employment manual while Mr. Quinn and Mr. Kvinge were employed there, but it neither addressed trade secrets nor confidentiality. (Doc. 79 at ¶ 9). Extreme hands out a printed copy of its Training Manuals to each new employee who is engaged in the tasks described in the Training Manuals. (*See id.* at ¶ 35; Doc. 103 at ¶ 35). But Extreme has no written policies, practices, or procedures requiring employees to return its Training Manuals at any point in time after they are given out. (Doc. 79 at ¶ 38). None of the training manuals is stamped as confidential. (*Id.* at ¶ 39). Digital copies of Extreme's manuals are maintained on its server, where access to the digital Training Manuals does not require a password for upper-level employees. (*See id.* at ¶ 40; Doc. 103 at ¶ 40).

Several months after the individual defendants resigned, Extreme created a new written employment agreement intended to protect its trade secrets and confidential information. (*See* Doc. 79 at ¶ 19; Doc. 103 at ¶ 19).

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A district court must grant a motion for summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1299 (11th Cir. 2018) (citation and internal quotation marks omitted).

An issue is "genuine" if a rational trier of fact, viewing all of the record evidence, could find in favor of the nonmoving party. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (citation omitted). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004) (citations omitted). In ruling on a motion for summary judgment, courts must "resolve all ambiguities and draw reasonable factual inferences from the evidence in the non-movant's favor." *Travelers Prop. Cas. Co. of Am. v. Moore*, 763 F.3d 1265, 1268 (11th Cir. 2014) (citation and internal quotation marks omitted).

The moving party bears "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has done so, the burden flips to the non-moving party to demonstrate the presence of a genuine dispute through citations to specific portions of the record. Fed. R. Civ. P. 56(c). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the Court may . . . consider the fact undisputed for purposes of the motion. . . ." Fed. R. Civ. P. 56(e), (e)(2).

## DISCUSSION

### I. The Court grants summary judgment in favor of Defendants on Counts I–II, because Plaintiff failed to take reasonable measures to protect its information.

On Counts I and II, Defendants argue that the undisputed record evidence demonstrates that Plaintiff does not possess a trade secret. (Doc. 81 at 5–18). Therefore, Defendants argue that they are entitled to summary judgment that no trade secret was misappropriated. (*Id.* at 11–15). Resolving all ambiguities and drawing factual inferences in Plaintiff's favor, this Court agrees with Defendants and finds that Defendants' Motion for Summary Judgment (Doc. 81) is due to be **GRANTED in part as to** Counts I and II.

Defendants argue in their motion for summary judgment that Plaintiff has failed to demonstrate that any trade secrets exist in its possession and that the functionality of an outside-diameter honing tool has been in the public domain for over a century through patents. (Doc. 81 at 2–3). Furthermore, Defendants argue that Plaintiff failed to take reasonable steps to protect any information it possessed. (Doc. 81 at 14–16). Plaintiff responds in its opposition, contending that the combination of feed screw coating preparation procedures, specific HVOF thermal spray coating application procedures, outside-diameter grinding procedures, proprietary tooling usage, and specific diamond polishing methods represents protectable trade secret information. (Doc. 102 at 4–7). Additionally, Plaintiff states that trade secret protection applies even if a part of a process is the subject of a patent (Doc. 102 at 9–10), and that it took reasonable steps to protect its hones, thereby precluding summary judgment on this factual dispute. (Doc. 102 at 11–13). In their reply, Defendants reassert that Plaintiff fails to describe its trade secret with sufficient particularity and fails to show that it engaged in reasonable measures to maintain secrecy over its alleged trade secret. (Doc. 107 at 1–3).

Plaintiff made its claims for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") (Count I) and the Florida Uniform Trade Secrets Act ("FUTSA") (Count II). The DTSA "creates a federal cause of action that largely mirrors FUTSA," and the definitions of "trade secret" and "misappropriation" are "substantially equivalent" under both statutes. *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 n.13 (11th Cir. 2020). Consequently,

the Court "won't undertake a separate analysis of [the] DTSA claim." *Id.* To establish liability under both statutes, Plaintiff needs to show that "(1) it possessed a trade secret and (2) the secret was misappropriated." *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018) (internal quotation marks omitted). Taking the first part of the test, Fla. Stat. § 688.002(4) defines a trade secret as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) [d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.*

In other words, to prove that there is a trade secret, Plaintiff must show that it possessed confidential information and took reasonable steps to protect its secrecy. *See Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998).

Here, viewing the evidence in the light most favorable to Plaintiff, the Court finds that no reasonable jury could find that Plaintiff reasonably protected the secrecy of the alleged information, failing that definitional arm of a trade secret required under Fla. Stat. § 688.002(4). Extreme claims that the totality of Extreme Coatings' feed screw refurbishment and recoating process constitutes a trade secret. (Doc. 102 at 4–7). Even presuming that the information on the overall

refurbishment and recoating process is confidential, Extreme did not take reasonable steps to protect its secrecy.

To start, Extreme had an employment manual while Mr. Quinn and Mr. Kvinge were employed there that did not address trade secrets or their confidentiality. (Doc. 79 at ¶ 9). Furthermore, Extreme has no written non-disclosure or confidentiality agreements with either Mr. Quinn or Mr. Kvinge. (*See* Doc. 79 at ¶¶ 5–8; Doc. 103 at ¶¶ 5–8).

In addition, Extreme provides a printed copy of its Training Manual to each new employee who is engaged in the tasks described in the Manual. (*See* Doc. 75 at 41:25–42:7). These Training Manuals have most of Extreme's technical procedures. (*Id.* at 40:18–22). But Extreme has no written policies, practices or procedures requiring its employees to return Training Manuals at any point in time after they are given out. (*Id.* at 46:4–8). Moreover, none of the training manuals is stamped as confidential. (*Id.* at 30:23–31:8).

Arguing that it reasonably protected the information on its process, Extreme points to Mr. Nagle's deposition in which he states that he advised employees that training manuals containing Extreme Coatings' processes and procedures were proprietary information. (*See id.* at 40:23–41:24). Other than mere verbal statements advising employees that the technical procedures in the Training Manuals were proprietary, Extreme does not reference any other evidence of reasonable steps it took to protect the secrecy of its process information.

*See Yellowfin*, 898 F.3d at 1300 ("Other than . . . general verbal statements warning employees not to share its Customer Information with third parties . . . [the company] references no evidence corroborating the implicit confidential relationship."). Extreme "compromised the efficacy" of this verbal warning by failing to have a policy prohibiting the employees' retention of the physical training manuals. *See id.*

Overall, Extreme abandoned all oversight in the security of the purported confidential information. *See Yellowfin,* 898 F.3d at 1300–01. Digital copies of Extreme's manuals are maintained on its server, where access to the digital Training Manuals does not require a password. (*See* Doc. 75 at 42:18–43:4). Specifically, Plaintiff states that the digital manuals did not have password protection for upper-level employees. (Doc. 103 at ¶ 40). Presuming that to be the case, upper-level employees such as Mr. Quinn and Mr. Kvinge then had unfettered access to the digital Training Manuals and free rein on the information on Extreme's process therein. Therefore, no reasonable jury could find that Extreme employed reasonable efforts to secure the information.

Viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could conclude that Plaintiff reasonably protected the secrecy of the information on Extreme's coating process. The Court therefore finds that no genuine issues of material fact remain on the existence of a trade secret, and Defendants are entitled to judgment as a matter of law. Therefore, the Court

grants summary judgment in favor of Defendants as to Plaintiff's DTSA and FUTSA claims set forth in Counts I and II.

**II. Counts III–IV are dismissed without prejudice, because the court declines to exercise supplemental jurisdiction over the remaining state law claims in light of the summary judgment on Counts I–II.**

As an initial matter, this Court lacks independent subject-matter jurisdiction over the remaining state law claims of breach of fiduciary duty ("Count III") and tortious interference ("Count IV"). Federal courts are courts of limited jurisdiction. Counts III and IV are state law claims that cannot, on their own, support federal-question jurisdiction. 28 U.S.C. § 1331 ("[D]istrict courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). And there is no diversity jurisdiction where the Plaintiff and Defendants are Florida citizens or entities. (Doc. 22 at 2–3); *see* 28 U.S.C. § 1332.

Though a federal court may exercise supplemental jurisdiction over state law claims where those claims arise from the same conduct and circumstances as the federal claims, the Court declines to do so here. *See* 28 U.S.C. § 1367; *Crosby v. Paulk*, 187 F.3d 1339, 1352 (11th Cir. 1999); *Handi-Van Inc. v. Broward Cnty. Fla.*, 445 F. App'x. 165, 170 (11th Cir. 2011); *Jackson v. Corizon Health, Inc.*, No. 20-14737, 2022 WL 303288, at *7 (11th Cir. Feb. 2, 2022).

The Court may decline to exercise supplemental jurisdiction over such claims after the Court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Whether to exercise supplemental jurisdiction over these state

law claims is a decision "vested in the sound discretion of the district court." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002).

"Where § 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction." *Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997). In the interest of judicial economy, convenience, fairness, and comity, "[s]tate courts, not federal courts, should be the final arbiters of state law." *Id.* (citing *Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1553 (11th Cir. 1992)).

Here, the Court declines to exercise supplemental jurisdiction over the state law claims set forth in Counts III and IV. This Court finds, in its discretion, that it should avoid deciding any independent state law claims that may or may not exist. This is best left to the Florida state courts. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."). Consequently, the state law claims in Counts III and IV are dismissed without prejudice. In turn, Plaintiff's Corrected Motion for Partial Summary Judgment as to Liability for Breach of Fiduciary Duty (Count III) (Doc. 84) is due to be **DENIED as moot**.

## CONCLUSION

The Court expended considerable time and resources combing through the record in this case, as the briefing was deficient in pointing to the record in many applicable places. That said, this Court is confident that it reviewed all applicable record evidence in this case. Defendants' Motion for Summary Judgment on all Four Counts of the Amended Complaint (Doc. 81) is **GRANTED in part** on Counts I and II of the Amended Complaint (Doc. 22). Because the Court declines to exercise supplemental jurisdiction over the state law claims, Counts III and IV are **DISMISSED** without prejudice. Plaintiff's Corrected Motion for Partial Summary Judgment as to Liability for Breach of Fiduciary Duty (Count III) (Doc. 84) is **DENIED as moot**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants as to Counts I and II, dismiss without prejudice Counts III and IV, deny as moot Plaintiff's Corrected Motion for Partial Summary Judgment as to Liability for Breach of Fiduciary Duty (Count III), terminate any pending deadlines, deny any pending motions as moot, and close the file.

**IT IS ORDERED** in Tampa, Florida, on August 6, 2026.

John L. Badalamenti

**JOHN L. BADALAMENTI**
UNITED STATES DISTRICT JUDGE